WILLIAM CORNING, RESPONDENT, v. NATHAN P. POND, AS ASSIGNEE, AND OTHERS, APPELLANTS.

*Purchase of notes at a discount — when not usurious — right of a debtor to compel his creditors to enforce securities in his hands — when the latter is not required to avail himself of them — sale of pledged securities at auction — when it is not invalidated by the agreement of the creditor not to bid.*

APPEAL from a judgment of foreclosure, entered in Monroe county upon the report of a referee.

August 1, 1874, Charles N. Briggs purchased of his brother John T. Briggs, his interest in the copartnership business, and delivered to him two promissory notes of that date for $10,000 each, bearing three and one-half per cent interest, and John T. continued to hold and own the notes until the 22d day of December, 1877, when he sold and transferred them to the plaintiff with a guaranty indorsed upon them. Upon the day of the sale of the notes Charles indorsed upon them an agreement, whereby he bound himself to pay interest on each note after it became due, at the rate of seven per cent per annum.

The referee has found as a fact, that on the 22d day of December, 1877, the notes were sold by John to the plaintiff at a discount of twelve per cent, and that the amount of the price was placed to the credit of John upon plaintiff's bank books, and subsequently drawn out by the several checks of the seller. And that at the time of the sale of the notes the seller, John T., made and executed the mortgage set out in the complaint to secure the guaranty given by the seller upon the notes. When the mortgage was given the plaintiff took a bond from John T. in the penal sum of $40,000, to be void upon the payment of $20,000 on the 1st day of January, 1879, and the mortgage referred to the bond, and stated that the mortgage was collateral to the bond. Upon the same day John T. and the plaintiff signed a certificate to the effect that the mortgage was given as a concurrent security for the payment of two notes, $10,000 each, made by Charles Briggs payable to the order John T. Briggs, dated August 1, 1874, and which said notes were this day indorsed *and transferred by said John T. Briggs* to William Corning.

Before the referee it was insisted that the transaction was a loan to Charles N., and that as it was a loan at a greater rate than lawful interest it was void. On the contrary, it was insisted by the plaintiff that he found in the hands of John T. business paper and purchased it of John, and took his guaranty of payment, together with a certificate to the effect that the notes were valid and that there were no defenses to them, and that the certificate was "made to accompany the transfer of the note" and that the same was taken by William Corning on the faith thereof.

The court at General Term, after holding that the finding of the referee was in accordance with the evidence, said : "Nor do we think the transaction was such as to take away the business character of the notes and thus render the sale of them at a discount an infraction of the usury laws. (*Crane* v. *Price*, 35 N. Y., 499.)

"Nor could any private arrangement entered into between John T. and Charles N. as to how the transaction should be regarded vary the same as to the plaintiff, in the absence of knowledge thereof and assent thereto by the plaintiff. (*Smith, Admrs.*, v. *Hathorn*, 25 Hun, 159 ; *Association, etc.*, v. *Eagleson*, 60 How., 9 ; *Erwin* v. *Neversink Steamboat Co.*, 23 Hun, 578.)

"*Powell* v. *Waters* (17 John., 176) is cited by appellants in support of the argument that the transaction here was usurious. In that case the note which was discounted at a usurious rate was made to raise money upon, and therefore the defense was properly sustained.

"*Sweet* v. *Chapman* (7 Hun, 577) does not aid the appellants. In that case the note sold at usurious discount was not valid in the hands of the payee making the sale, and it was said by Noxon, J., for this court in that case, that 'the rule appears to be settled that a promissory note, to be the subject of sale, *must be an existing valid* note *in the hands* of the payee, and given for some actual consideration so that it can be enforced between the original parties ; and if not valid in the hands of the payee cannot be rendered valid by a sale to a *bona fide* purchaser at a rate of interest exceeding seven per cent.'

"*Hall* v. *Wilson* (16 Barb., 548) is to the same effect, as the note was stolen before it had any inception and sold for a usurious rate and therefore held invalid.    *    *    *

"It was competent for the debtor to change the rate of interest from three and a-half per cent to seven by his contract. Had the rate not been changed by contract and the notes had fallen due, the interest would have remained at the lower rate until the debt was merged in a judgment or decree. (*Miller* v. *Burroughs*, 4 Johns. Ch., 436.) The contract or stipulation of the debtor to change the interest upon his notes from three and a-half to seven per cent being made by the debtor bound him, and the creditor John T. had a right to sell the notes as thus changed, and the debtor was not required to pay any more to satisfy his legal obligations when they were in the hands of the plaintiff than he had lawfully undertaken to pay to the original payee of the notes. Though the referee seems to have been of the opinion that the debtor would have been obliged to pay seven per cent after the notes matured, if the agreement had not been made, it is not such a mistake of law as materially to affect the result reached, as the payments upon the debt must be assumed to have satisfied the interest. (*Mowry* v. *Bishop*, 5 Paige, 98; *Ritter* v. *Phillips*, 53 N. Y., 590; *N. Y. Life Ins. and T. Co.* v. *Manning*, 3 Sandf. Ch., 58.) *   *   *

"On the 22d day of December, 1877, as security for the payment of the two notes of $10,000 each, Charles N. Briggs assigned and transferred and set over to the plaintiff 'all money and sums of money that may become due upon some forty-eight orders, receipts or contracts in order books for seeds, to hold and *retain* the same *   *   * until said notes are paid; it being understood that the said Corning *is not required* to notify the person signing or making said contract, orders or receipts of *this transfer*, also that said Corning shall at any time deliver and surrender to said Briggs any of said contracts, orders or receipts *upon* being *paid* the amount thereof as expressed upon the face, less the commissions and reductions therein made and allowed, to the persons making said orders, receipts or contracts.'

"The assignment contained the following: 'It is understood that the said Corning is *not required to take any steps* to perform said contracts, receipts or orders on the part of Briggs & Brother, *and that when said notes shall have become due* and payable (if the same shall not be paid) then the said Corning *may sell* said books, contracts, orders and receipts at public auction, first giving said Briggs

& Brother ten days' notice of the time and place of such sale, and apply the net proceeds of such sale upon said notes, and the purchaser at such sale shall acquire the absolute title to such books, orders, contracts or receipts.'

"It is furthermore agreed that when the above described are paid, then the said Corning is to give up and surrender the book attached thereto.

"The referee found that the persons making said orders resided in eleven different States, and that the orders had been obtained by 'sending out agents over different routes in said States; that the said books were marked and arranged according to said routes, and numbered so that each book contained usually one hundred orders and corresponding receipts and contracts.'

"Eight of the books were returned, and 'the remaining forty of said books were permanently retained by the plaintiff as collateral security for the payment of said notes.'

"It appears the seed orders fell due in the summer of 1878, and that the proper and best time to make collections on them  *  * was from the middle of July, 1878, and onward for three, four or five months thereafter, of which the plaintiff had notice, and the usual course of business had been to send out agents on the different routes in different States during that period of the year, to obtain *new* orders for seeds and at the same time make collections upon the orders  *  *  obtained the year before.

"It was found that on the 14th of September, 1878, John T. Briggs made a general assignment of all his property to Pond for the benefit of creditors, who about the same time also became the assignee of Charles N. Briggs.

"The referee has also found that on the 26th of September, 1878, the said Pond called upon the plaintiff and urged the plaintiff to collect the money due and collectible upon the orders, or allow him to collect them as assignee, insisting it was plaintiff's *duty* to do so. Plaintiff insisted he was not obliged to make collections, and declined to do so. Pond offered to collect, or have agents collect, and apply money upon the notes. Plaintiff declined to allow Pond to collect by his agents unless he would guaranty the faithfulness of the agents. Prior to Charles N. Briggs's assignment, he had transferred all his right, title and interest in the unsold seeds and

contracts to Hiram Sibley & Co., a responsible firm in Rochester, and that firm desired to obtain possession and control of the seed books, and the firm claimed that unsold and unreturned seeds belonged to said firm, and the plaintiff claimed they were pledged to him and declined to give up the books to that firm unless they 'would pay or secure him the whole amount unpaid on said notes, and in that event he would transfer them with all his securities for the payment to them.'

"There was no offer by Pond, or John T. or Charles, 'to furnish any money to the plaintiff to pay the costs and expenses of making collections on said books. The referee has found that the balance due and unpaid upon *said notes* might have been collected by the plaintiff, with the costs and expenses of collection upon said books * * * by his employing and sending *out* a sufficient number of suitable agents for that purpose, and advancing the money to them to pay their expenses, becoming responsible to them for their pay, and assuming the burdens, risks and responsibilities incident to the business.'

"There is no finding or evidence that any of the debtors on the orders or seed books became insolvent after the assignment and before the sale of them at auction, pursuant to the power in the assignment, which sale took place on the 15th of February, 1879, after proper notice.

"It is now insisted, on behalf of the appellants, that it was the duty of the plaintiff to collect the securities and the seed-book orders. Turning to the agreement under which they were assigned, we find no express duty stipulated for, no requirement in terms that the creditor should collect or enforce them, no such covenant to take proper means for the collection as in *Hoard* v. *Garner* (10 N. Y., 261), but, on the contrary, it is provided that the creditor may, 'when said notes shall become due and payable, *then* the said Corning may sell said books at public auction.'

"This provision provides for a mode of realizing money out of the securities, and it is not too much to say that it was the mode and the only mode contemplated by the parties for realizing money out of the orders, in case payments were not voluntarily made.

"In the same instrument is a provision that 'Corning shall at any time deliver and surrender to said Briggs any of said contracts

\* \* , \* upon being paid *the amount thereof* as expressed upon the face,' which provision is also suggestive of the intent of the parties that the creditor should not be required to enforce the contracts or attempt to realize out of them otherwise than by a sale, in case it should become necessary to realize, 'when said notes shall become due and payable.' By their terms, one of the notes was due and payable 1st of January, 1878, and the other not until 1st of January, 1879, and it is not apparent that the parties intended to impose duty upon the creditor, as to the seed-book contracts in the summer and fall of 1878, to make collections. It is more reasonable to suppose it was their intent that the debtor should, by paying the full value of any book he might wish to use, regain possession thereof to collect. It follows from these views of the contract of assignment that the plaintiff was not guilty of a breach of duty in not making collections or suffering others to take the seed books, without paying him his debts. The case is unlike *Remsen* v. *Beekman* (25 N. Y., 552), where it was said by the court that a duty was imposed upon the creditor to proceed to realize out of the primary fund, and that his negligence was the predicate for refusing him the right to call upon his surety or his collateral.

"As we have seen, there was no stipulated, express obligation to collect the debt out of the collaterals; rather it was within the contemplation of the parties that, in case there was need to resort to the collateral orders, a sale of them should be had, rather than a collection. That being the case, we are of the opinion that the creditor was 'not under an equitable duty to collect his debt from the collaterals of the principal debt,' or otherwise than by a sale thereof.

"John T. Briggs could have paid off the plaintiff and thus received the seed orders and collected them, and in that manner protected himself against the consequences of delay. ( *Wells* v. *Mann*, 45 N. Y., 327; *Board of Supervisors* v. *Otis*, 62 id., 88; *Clark* v. *Sickler*, 64 id., 231; *Colgrove* v. *Tallman*, 67 id., 95; *Toles* v. *Adee*, 84 id., 239; *Schroeppell* v. *Shaw*, 3 id., 460.)

"By the assignment of the seed orders *no duty to take the risks*, burdens and expenses, as well as dangers in their collection, was imposed upon the creditor, and as there was no proof that any of the debtors upon the seed orders became insolvent after notice to

collect and before the sale, we are of the opinion that the referee properly refused to find damages against the creditor because he did not proceed to collect or allow Pond or Sibley & Co. to take possession of the order books and collect them. It is urged that the creditor ought to have sold the seed orders earlier. By the terms of the assignment of them, it was provided that, 'when said notes shall become due and payable, * * * then the said Carney may sell said books, contracts or receipts at public auction.'

"The language seems to refer to one sale. It is not made to apply to the notes separately.

"The last note did not fall due until the 1st day of January, 1879, and the notice was given on the fifth of February or earlier, of a sale to be held on the 15th of February, 1879. There is nothing in the findings or in the case to indicate that any loss was suffered between the 1st day of January, 1879, and the day of such auction sale of the seed-book orders, nor was there any request that an earlier day be fixed or that a sale be had under the power either before or after the 1st of January, 1879. Mere delay is not sufficient to predicate damages upon in such case. (*Schroppel* v. *Shaw, supra*.)

"Plaintiff was not called upon to show that the delay did not cause injury. The rule laid down in cases where the creditor has by an actual release discharged a security, that the burden of proof is upon the creditor to show that no injury was caused to the party thereby, has no application,

"Such is the rule laid down in *Fielding* v. *Waterhouse* (8 Jones & S., 424), cited by appellants. In *Blydenburgh* v. *Bingham* (38 N. Y., 371) it was held that the burden was upon the creditor to show that the debtor in fact had no interest in the lands released from a nominal lien. That rule adopted in *Fielding* v. *Waterhouse* (*supra*) has no application here. Appellants now argue that 'the conduct of the sale of the securities was in fraud of the rights of John T. Briggs, and Corning has therefore forfeited his right to call upon him or the security furnished by him.'

"This seems to be based upon the fact that the plaintiff attended the sale, made a bid which was raised, and thereupon one Charles T. Briggs, acting as agent for Tripp, asked the plaintiff not to bid any more, stating that he wanted Tripp to buy the seed books and

promising his honor that all that was realized upon them should be applied to the discharge of the plaintiff's debt, and that the plaintiff thereupon ceased to bid, and the books were sold on a further bid of $10,300 to Tripp. This took place in the presence of Tripp, Pond, John T. Briggs, Charles N. Briggs, an attorney of Sibley & Company, and two members of that firm and a number of others.

"It seems the sale was free from actual fraud, and it remains for us to consider whether the plaintiff, by omitting to bid, was guilty of fraud or a breach of duty. Pond, the assignee of both Charles and John Briggs, was present and could have protected his rights, and it must be assumed that he acquiesced in the sale.

"But it is said that because the plaintiff had bid, though he was not bound to bid, and his purchase at the sale would not have cut off the parties in interest from the right of redemption (Edw. on Bailment, 260; *Pulver* v. *Richardson*, 3 T. & Cook, 436; *Fraser* v. *Gilbert*, 11 Hun, 634), the sale which took place was void. To sustain this position the learned counsel for the appellants refer us to the cases in the sixth, eight and thirteenth of Johnson, which we must examine.

"The case of *Doolin* v. *Ward* (6 Johns , 194) was one where two parties agreed to attend the sale, and agreed that one should not bid against the other and that one should bid off as he did the articles and 'divide the same equally.' Subsequently upon refusal to divide suit was brought for half the profits, and the court held the agreement was a *nudum pactum* and that there could be no recovery. *Wilbur* v. *How* (8 Johns. 444) was where a similar agreement was made between two parties, as to a contract for making a road and it was struck off to one, 'and on suit brought for damages by reason of refusal to divide, the court held the agreement was without consideration and void.' *Thompson* v. *Davies* (13 Johns. 112) was a case where a sale upon several executions was to be had and there was an agreement to prevent competition, and it was held that as the law had regulated the course of sales on execution, 'that a combination to prevent a competition was contrary to public policy,' and from the case it may be said that it was decided that any agreement by which a party suffered himself to be bought off in a way which might prevent a fair competition was void.

"The position taken by the appellants is not supported by these

cases. The sale now in review was open, public and fair in the presence of parties interested and others, and the property was sold to the highest bidder. And he was competent to purchase and acquired a valid title, and there is no occasion or attempt to assert and enforce any supposed agreement between the plaintiff here and Tripp or his agent. The power of sale was executed and the plaintiff has been charged with the proceeds of that sale, and we see nothing in the evidence or findings requiring us to go behind it at the instance of John T. Briggs or his assignee. This action is upon the bond and mortgage of the defendant John T. Briggs, and he is made a party defendant together with his general assignee, and we see no error in the conclusion of the referee that Charles N. Briggs was not a necessary party.

"He had made a general assignment to the defendant Pond, and there is nothing in the answer averring that the assignee of Charles was a necessary party. Nor was such a position taken upon the trial. It is now too late to raise that question for the first time upon this appeal."

*J. & Q. Van Voorhis*, for the appellants.

*Edward Harris*, for the respondent.

Opinion by HARDIN, J.; SMITH, P. J., and PARKER, J., concurred.

Judgment affirmed, with costs